# In the United States Court of Federal Claims

No. 18-1655
Filed: April 1, 2019
Reissued: April 22, 2019[1]

|  |  |  |
|---|---|---|
| INSERSO CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | Post-Award Bid Protest; Judgment on the |
| Defendant, | ) | Administrative Record |
| | ) | |
| and | ) | |
| | ) | |
| FEDITC, LLC, and | ) | |
| RIVERSIDE ENGINEERING, LLC, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |
| | ) | |

*Richard P. Rector*, DLA Piper LLP (US), Washington, DC, for plaintiff.

*Sonia W. Murphy*, U.S. Department of Justice, Commercial Litigation Branch, Civil Division, Washington, DC, for defendant.

*Jeffery M. Chiow*, Rogers Joseph O'Donnell, P.C., Washington, DC, for defendant-intervenor.

*Gary J. Campbell*, Womble Bond Dickinson LLP, Washington, DC, for defendant-intervenor.

## OPINION AND ORDER

***SMITH*, Senior Judge**

This post-award bid protest comes before the Court on the parties' Cross-Motions for Judgment on the Administrative Record.  Plaintiff, Inserso Corporation ("Inserso"), filed its Complaint on October 25, 2018, objecting to the United States Defense Information Services Agency's ("Agency") award of Solicitation No. HC1028-15-R-0030 ("Solicitation").  *See generally* Complaint for Declaratory and Injunctive Relief (hereinafter "Compl.").  Plaintiff asks this Court (1) to equalize the competition by providing all offerors access to the unequally

---

[1]     An unredacted version of this opinion was issued under seal on April 1, 2019.  The parties were given an opportunity to propose redactions, but no such proposals were made.

disclosed information; (2) to order the Agency to award a contract to plaintiff; or (3) to remand the issue to the Agency to take appropriate actions.  Plaintiff's Motion for Judgment on the Administrative Record (hereinafter "Pl.'s MJAR") at 44–45.  For the following reasons, plaintiff's Motion for Judgment on the Administrative Record is denied, and defendant and defendant-intervenors' Cross-Motions for Judgment on the Administrative Record are granted.

## I.    Background

On March 2, 2016, the Agency issued Solicitation No. HC1028-15-R-0030 for the ENCORE III contract to procure information technology ("IT") services.  Administrative Record (hereinafter "AR") 1, 12.  The Solicitation sought to meet the Department of Defense's ("DoD") effort to "achieve information superiority" by providing IT solutions to the military service branches, the DoD, and other federal agencies.  *Id.* at 1784.  The Solicitation contemplated the award of Indefinite-Delivery/Indefinite Quantity ("ID/IQ") contracts under two separate "suites"—a full-and-open ("F&O") suite and a small-business ("SB") suite.  *Id.* at 1781, 1891.  The scope of work for both suites was identical as set forth in the Performance Work Statement ("PWS").  *Id.* at 1784–86.  Up to twenty awards would be made to offerors under each suite, with a maximum value of $17.5 billion for the sum of two suites, spread out over a ten-year period.  *Id.* at 1782.  Awardees were not guaranteed a task order, but instead would be afforded a "fair opportunity to be considered for specific task and delivery orders issued against the ENCORE III contract."  *Id.* at 1781.

Offerors could submit a proposal in both suites but could only receive one award.  AR 1892.  The Agency made awards to offerors in both suites on a lowest price, technically acceptable basis after consideration of three evaluation factors: (1) technical/management approach; (2) past performance; and (3) cost/price.  *Id.* at 1910–19.  The Agency provided duty descriptions and qualification requirements associated with 116 labor categories.  *See generally id.* at 1902, 1927–58.  Offerors were directed to list Fixed Price ("FP") labor rates and Cost Reimbursable ("CR") labor rates at both government and contractor sites for each labor category on a "pricing template" spreadsheet.  *Id.* at 1902.  If offerors were awarded the contract, their FP labor rates would be incorporated into their contracts, but CR labor rates would not.  *Id.* at 1902, 1904.

The Solicitation outlined how the Agency would evaluate proposals in each suite.  After calculating the rates for each labor category ("LCAT") and adjusting the rates based on pre-established escalation factors for years beyond the first year, Agency evaluators multiplied each LCAT rate by the estimated number of hours required to reach the total amount for each LCAT per year.  *Id.* at 1902, 1910.  The sum of all LCATs over the lifetime of the contract yielded each offeror's Total Proposed Price ("TPP").  AR 1910.  Neither the Solicitation nor the post-award debriefing disclosed the estimated number of hours allocated to each LCAT.  *Id.* at 1918.

The Solicitation directed the Agency to evaluate the CR portion of the TPP through a cost-realism analysis and calculate a Most Probable Price for the CR portion for all LCATs.  *Id.* at 1919.  The Agency then determined the Total Evaluated Price ("TEP") by adding the TPP for the FP portion of the proposal to the Most Probable Cost for the CR portion of the proposal.  *Id.*

at 1920.  Proposals were then arranged in order from the lowest TEP to the highest TEP and evaluated for "compliance with other terms and conditions" outlined in the Solicitation.  *Id.* at 1910–11, 1920.  The twenty offerors in each suite that presented the lowest-price, technically acceptable proposals were to receive contract awards.  *Id.*

The Agency received initial proposals for the F&O suite on October 21, 2016, and awards were issued to the twenty lowest-priced, technically acceptable offerors on October 19, 2017.  *See* AR 86821–36.  In November 2017, debriefings were provided to unsuccessful offerors and Qbase, a successful offeror who requested a debriefing.  *See, e.g.*, AR 86875–76; *see also id.* at 87975.  The content of the debriefings included the TPPs, TEPs, technical evaluation ratings, and past performance ratings for the twenty lowest-priced proposals, and unsuccessful offerors' Final Consensus Reports.  *See, e.g.*, AR 86851; *id.* at 86840–50.  The final TEPs for awardees of the F&O suite ranged from $5,295,457,319 to $6,906,046,117.  *Id.* at 86851–54.

Three unsuccessful F&O offerors—NCI, Peerless, and PSI—and Qbase, an awardee who participated in the aforementioned debriefings, were also offerors in the SB suite competition, through joint venture ("JV") partnerships with small businesses.  *Id.* at 86837, 86874, 88848, 87975; AR 88949 (Innovations JV LLC); AR 88957 (Madian IT Solutions, LLC); AR 88964 (Superior Government Solutions, LLC); AR 88963 (SierTek-Peerless JV, LLC).  Each of those offerors was awarded a contract in the SB suite.  *Id.* at 78892.

The Agency received initial proposals for the SB suite on October 21, 2016, and, after several rounds of Evaluation Notices ("EN") and revised proposals, the Agency issued its awards on August 24, 2018.  *See, e.g.*, AR 4371; *id.* at 9105; *id.* at 16654; *id.* at 24567; *id.* at 79527.  SB offerors received their TEPs on April 24, 2018, prior to submitting their first and second final proposal revisions.  *Id.* at 67568–625.  Plaintiff received a Notice of Unsuccessful Offeror on September 7, 2018.  *Id.* at 78892.  Plaintiff was the twenty-third lowest offeror with the TEP of $7,760,007,495.  *Id.* at 78897.  The final TEPs for awardees of the SB suite ranged from $5,338,273,636 to $7,745,667,644.  *Id.* at 78892.

On October 25, 2018, Inserso filed its Complaint.  *See generally* Compl.  In its Complaint, plaintiff alleges three theories of liability.  *See id.* at 1–2.  First, the Agency's release of information under the F&O suite created organizational conflicts of interest ("OCI") and an unfair competitive advantage for some SB offerors.  *See id.* at 1.  Had Inserso received similar information, it would have won the SB contract.  Second, the Agency should not have awarded a contract to Madian IT Solutions, LLC in the SB suite because it is the alter ego of Qbase, LLC., an awardee in the F&O suite.  *See id.* at 2.  However, during the course of litigation, the plaintiff abandoned this claim.  Finally, plaintiff alleged in its Complaint that the Agency failed to treat offerors equally, which violated regulatory requirements set forth in the Federal Acquisition Regulation ("FAR") and acted arbitrarily and capriciously in awarding SB contracts.  *See id.* at 1–2.  On December 6, 2018, plaintiff filed its Motion for Judgment on the Administrative Record and its Motion to Supplement the Administrative Record.  *See generally* Pl.'s MJAR; Plaintiff's Motion to Supplement the Administrative Record.  On January 11, 2019, defendant filed its Cross-Motion for Judgment Upon the Administrative Record and Opposition to Plaintiff's Motion for Judgment on the Administrative Record.  *See generally* Defendant's Motion for

Judgment Upon the Administrative Record and Opposition to Plaintiff's Cross-motion for Judgment on the Administrative Record (hereinafter "Def.'s CMJAR").  Additionally, on January 11, 2019, defendant filed its Response to plaintiff's Motion to Supplement the Administrative Record and its Cross-Motion to Supplement the Administrative Record.  *See generally* Defendant's Response to Plaintiff's Motion to Supplement the Administrative Record and Cross-Motion to Supplement the Administrative Record.  On January 4, 2019 and January 11, 2019, intervenors FEDITC and Riverside filed their respective Cross-Motions for Judgment on the Administrative Record.  *See generally* Intervenor's Opposition to Plaintiff's Motion for Judgment on the Administrative Record and Cross-Motion for Judgment on the Administrative Record (hereinafter "FEDITC's CMJAR"); Defendant-Intervenor Riverside Engineering's Opposition to Plaintiff's Motion for Judgment on the Administrative Record and Cross-Motion for Judgment on the Administrative Record (hereinafter "Riverside's CMJAR").

On January 25, 2019, plaintiff filed its Response to defendant and defendant-intervenors' Cross-Motions for Judgment on the Administrative Record and Reply in Support of its Motion for Judgment on the Administrative Record.  *See generally* Plaintiff's Response to Defendant's & Intervenors' Cross-Motions for Judgment on the Administrative Record & Reply in Support of its Motion for Judgment on the Administrative Record (hereinafter "Pl.'s Reply").  On February 8, 2019, defendant filed its Reply in Support of its Cross-Motion for Judgment Upon the Administrative Record.  *See generally* Defendant's Reply in Support of its Cross-Motion for Judgment Upon the Administrative Record (hereinafter "Def.'s Reply").  On February 7, 2019 and February 8, 2019, intervenors FEDITC and Riverside filed their respective Replies.  *See generally* Intervenor's Reply in Support of its Cross-Motion for Judgment on the Administrative Record (hereinafter "FEDITC's Reply"); Defendant-Intervenor Riverside Engineering's Reply to Plaintiff's Response to Defendant and Defendant-Intervenor's Cross-Motions for Judgment on the Administrative Record (hereinafter "Riverside's Reply").  The Court held oral argument on this matter on February 26, 2019.  The parties' motions are fully briefed and ripe for review.

## II.   Standard of Review

This Court's jurisdictional grant is found primarily in the Tucker Act, which provides the Court of Federal Claims with the power "to render any judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States . . . in cases not sounding in tort."  28 U.S.C. § 1491(a)(1) (2012).  Although the Tucker Act explicitly waives the sovereign immunity of the United States against such claims, it "does not create any substantive right enforceable against the United States for money damages."  *United States v. Testan*, 424 U.S. 392, 398 (1976).  Rather, to fall within the scope of the Tucker Act, "a plaintiff must identify a separate source of substantive law that creates the right to money damages."  *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (en banc in relevant part).

The Tucker Act also affords this Court with jurisdiction over bid protest actions.  28 U.S.C. § 1491(b).  This Court evaluates bid protests under the Administrative Procedure Act's ("APA") standard of review for agency actions.  *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005) (citing *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)).  Notably, agency procurement actions may be set

aside only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 28 U.S.C. § 1491(b)(4).  Moreover, "[t]he arbitrary and capricious standard applicable [in bid protests] is highly deferential." *Advanced Data Concepts v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000).  Agencies, and contracting officers in particular, are "'entitled to exercise discretion upon a broad range of issues confronting them' in the procurement process.'" *Savantage Fin. Servs. v. United States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010) (quoting *Impresa*, 238 F.3d at 1332).

Under Rule 52.1 of the Rules of the Court of Federal Claims ("RCFC"), a party may file a motion for judgment upon the administrative record for the Court to assess whether an administrative body, given all disputed and undisputed facts in the record, acted in compliance with the legal standards governing the decision under review.  *See Supreme Foodservice GmbH v. United States*, 109 Fed. Cl. 369, 382 (2013) (citing *Fort Carson Supp. Servs. v. United States*, 71 Fed. Cl. 585 (2006)).  On a motion for judgment upon the administrative record, the parties are limited to the AR, and the Court makes findings of fact as if it were conducting a trial on a paper record.  RCFC 52.1; *Bannum*, 404 F.3d at 1354.  Looking to the Administrative Record, the Court must determine whether a party has met its burden of proof based on the evidence in the record.  *Bannum*, 404 F.3d at 1355.  When a protestor claims that an agency's decision violates a statute, regulation, or procedure, the protestor must show that such alleged violation was "clear and prejudicial." *Impresa*, 238 F.3d at 1333.  The Court will "interfere with the government procurement process 'only in extremely limited circumstances.'" *EP Prods., Inc. v. United States*, 63 Fed. Cl. 220, 223 (2005) (quoting *CACI, Inc.-Fed. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989)).  "If the [C]ourt finds a reasonable basis for [an] agency's action, the [C]ourt should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989).  The Court cannot substitute its judgment for that of an agency, even if reasonable minds could reach differing conclusions.  *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974).

## III.    Discussion

### A.  OCI and Competitive Advantage

Plaintiff alleges that the Agency violated FAR 9.504(a) and 9.505(b) by failing to identify and evaluate a potential OCI during the acquisition process and by failing to prevent an unfair competitive advantage for the four SB/JV offerors competing in both suites.  Pl.'s Reply at 7–8.  The government argues that FAR 9.502 only applies to a party performing a Government contract.  Def.'s Reply at 4.  Plaintiff contends that FAR 9.505(b)(2) provides "[i]n addition to the other situations described in this subpart," an unfair competitive advantage exists when a contractor possesses certain information and is "competing for award of any Federal contract." Pl.'s Reply at 9–10.  Plaintiff argues that "subpart" refers to "Subpart 9.5" and interprets 9.505(b) as standing "in addition" to 9.502, rather than being limited by 9.502.  *Id.* at 11.  Based on its interpretation of FAR 9.505 and FAR 9.505(b), plaintiff concludes that an OCI can arise during the acquisition process.  *See generally id.* at 8–15.

The government argues that, even if an OCI could arise out of the acquisition process, one has not occurred here, because the information at issue was not "source selection information" and did not provide a competitive advantage to the four SB/JV offerors. Def.'s Reply at 9–10. The government further contends that the F&O TEPs became publicly available when F&O contracts were awarded, and, therefore, those TEPs did not qualify as "source selection information" under the definition of FAR 2.101. Id. at 11. The government continues by noting that the two suites were not identical, and the Agency never disclosed the estimated number of hours for each LCAT, so offerors could not have adjusted their TEPs based on that information alone. Id. at 10–11. Plaintiff argues that the TPPs and TEPs are "proposed prices and lists of those prices" under the definition of "source selection information" found in FAR 2.101. Pl.'s Reply at 9. Plaintiff further alleges that the winning F&O TEPs were competitively valuable because they were disclosed prior to the SB deadline for final proposed revisions, those TEPs provided a target range for offerors to use in revising their SB TEPs, and offerors could easily adjust their prices to fall within the target range without significant risk. See id. at 20–29.

The Court agrees with plaintiff's position that the nature of a multi-suite solicitation in which offerors can bid in multiple suites raises OCI concerns, particularly when the scope of work and evaluation factors are nearly identical for each suite. In a multi-suite solicitation, agencies can avoid this type of potential OCI by issuing awards and debriefings for all suites simultaneously, so competitively advantageous information from one suite cannot be used by offerors in subsequent proposals.

While the Court acknowledges the possibility that an OCI could arise out of the circumstances at issue here, the release of TEP information did not prejudice plaintiff. Prejudice is presumed once a potentially significant OCI is identified. NetStar-1 Gov't Consulting, Inc, v. United States, 101 Fed. Cl. 529 (2011), aff'd, 473 F. App'x 902 (Fed. Cir. 2012). The government can overcome the presumption of prejudice through a showing of compelling evidence to the contrary. See id. at 529. In the case at bar, even if an OCI existed, defendant and defendant-intervenors provided sufficient compelling evidence to rebut the presumption of prejudice.

### B. Impartial, Fair, and Equitable Treatment

Plaintiff alleges that, by sharing competitively sensitive pricing information with some, but not all, of the SB offerors, the Agency violated FAR 1.602-2(b) by failing to "[e]nsure that the contractors receive impartial, fair, and equitable treatment" throughout the course of the procurement. Pl.'s MJAR at 40; Pl.'s Reply at 44. The government responds by noting that certain provisions of the FAR required Agency disclosure of specific information once F&O awards were issued, but the disclosed information did not provide a significant competitive advantage to offerors participating in both suites. Def.'s Reply at 21; Def.'s CMJAR at 42.

The Court accepts plaintiff's proposition that potentially unfair and unequal treatment could arise under the particular circumstances at issue—the Agency distributed information to a limited number of SB offerors that could have provided a slight competitive advantage over offerors who did not receive the same information. Plaintiff correctly recognizes that the F&O awardees' TEPs provided a useful comparison tool that SB offerors could utilize as a benchmark

in revising their price proposals.  *See* Pl.'s Reply at 20–29.  However, even if the allegedly disparate treatment provided some offerors with a slight competitive advantage, the record indicates that plaintiff was not prejudiced by such treatment.

## C. Prejudice

"A protester must show not simply a significant error in the procurement process, but also that the error was prejudicial, if it is to prevail in a bid protest."  *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed. Cir. 1996).  Plaintiff can establish that prejudice existed "when it can show that but for the error, it would have had a substantial chance of securing the contract."  *Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1378 (Fed. Cir. 2009).  In the case at bar, even if the Agency's limited distribution of information resulted in an OCI or disparate treatment, there is no evidence that prejudice resulted from such a distribution.

The offerors who received the allegedly competitive information would still have submitted lower bids than the plaintiff, regardless of the Agency's information disbursement. The four SB/JV offerors that received debriefings had TEPs that fell within the winning range for the SB suite throughout the entire course of the procurement.  AR 78322; AR 78746; AR 79090; AR 79212.  In contrast, plaintiff's proposed TEP was higher than the winning range before the allegedly competitive information was distributed, and plaintiff's proposed TEP remained consistently higher than the winning range throughout every round of revisions.  *Id.* at 78409.  Defendant-intervenor, FEDITC, argues that, because all four challenged offerors were always lower-priced than plaintiff, releasing the information did not impact plaintiff's competitive standing.  FEDITC's CMJAR at 8.

Plaintiff argues that, were it privy to the same information, it could have easily revised its price and submitted a TEP within the winning range.  Pl.'s MJAR at 39; Pl.'s Reply at 40. Plaintiff argues that it would have adjusted the price downward by shifting its labor to lower-cost geographic regions, reducing its FP rates according to FP/CP hour split, and reducing its proposed fee percentage.  Pl.'s Reply 28–29; Pl.'s MJAR 34–35.  The government responds by alleging that plaintiff's TPP dropped by almost $1 billion from its final proposal, and any further reductions would have required documented support.  Def.'s CMJAR at 37; Def.'s Reply at 20. Defendant-intervenor, FEDITC, argues that, if the Agency had released the F&O awardees' TEPs to all offerors, the other offerors would also have discounted their prices to meet the "target range" along with plaintiff.  FEDITC's CMJAR at 8.  FEDITC further argues that, because plaintiff merely demonstrated it could have lowered its price to the top edge of the F&O winning range, plaintiff could not have sufficiently reduced its price to receive an award if other offerors made similar reductions.  *Id.* at 8–9.

The Court is persuaded by defendant and defendant-intervenors' arguments that no prejudice arose out of the Agency's actions.  The release of the allegedly advantageous information did not impact plaintiff's competitive standing in the SB suite.  Moreover, plaintiff has failed to establish that, but for those debriefings, it had a substantive chance of receiving an award.  The only scenario in which the Court can foresee plaintiff successfully adjusting its price enough to receive an award, is one in which only the plaintiff, but none of the other SB offerors, received the allegedly competitive information, which is not the applicable standard to find

prejudice.  The circumstances surrounding plaintiff's complaint are too attenuated for the Court to conclude that the allegedly competitive information negatively impacted the plaintiff's chance of award, let alone resulted in prejudice of any kind.  The Agency's actions were neither arbitrary, capricious, an abuse of discretion, nor contrary to law, and the Court will not set aside its award decision.

## IV.   Conclusion

For the reasons set forth above, plaintiff's MOTION for Judgment on the Administrative Record is **DENIED**.  Defendant and defendant-intervenors' CROSS-MOTIONS for Judgment on the Administrative Record are **GRANTED**.  Additionally, as the Court does not believe the information contained therein to be necessary for the effective administration of justice, both plaintiff's MOTION to supplement the Administrative Record and defendant's CROSS-MOTION to supplement the Administrative Record are hereby **DENIED**.  The Clerk is directed to enter judgment in favor of defendant and defendant-intervenors, consistent with this opinion.

**IT IS SO ORDERED.**

s/ *Loren A. Smith*

Loren A. Smith
Senior Judge